UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUBREY LAND, et al.,

      Plaintiffs,

v.                                                                    4:14cv347-WS

FLORIDA DEPARTMENT OF
CORRECTIONS, et al.,

      Defendants.

_____

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

Of the six plaintiffs in this case, five—Aubrey Land, David Clark, Doug

Glisson, John Ulm, and James Padgett—are currently employed by the Florida

Department of Corrections ("FDOC") as inspectors or supervisors in FDOC's

Office of Inspector General. The sixth plaintiff—Christina Bullins—was formerly

employed by FDOC as a Probation Supervisor.  All six (collectively, "Plaintiffs")

assert that they have been subjected to retaliation in violation of the First

Amendment's Speech and Petition Clauses.  Plaintiffs seek relief under 42 U.S.C.

§ 1983.

Before the court at this time is Defendants' motion to dismiss.  Doc. 16.

Defendants maintain that Plaintiffs' first amended complaint (doc. 11) fails to state

a claim under the First Amendment.[1]  The court agrees.

## I. THE ALLEGATIONS

Plaintiffs have alleged the following:[2]

In 2013, in their capacity as FDOC inspectors, Land, Ulm, Glissom, and

Padgett investigated allegations of prisoner/guard sexual activity, contraband

smuggling, inmate abuse by guards, and gang activity at Franklin Correctional

Institution ("FCI") in Franklin County, Florida.  1st Am. Compl. ¶ 6.  During the

---

[1]  Included in Defendants' motion to dismiss is a request for summary judgment as to one limited issue.  As to that issue only, Defendants have submitted evidentiary materials consisting of five pages.  Attached to Plaintiffs' response to Defendants' motion are twenty-four exhibits—consisting of hundreds of pages—that address matters that go far beyond the limited issue raised in the defendants' motion for summary judgment.  Plaintiffs have since filed additional evidentiary materials (docs. 18–20).  **The court has considered none of the evidentiary materials submitted by either Plaintiffs or Defendants but has, instead, limited its review to the allegations in Plaintiffs' first amended complaint.  The court decides this matter based solely on Defendants' motion to dismiss and Plaintiffs' response thereto.**

[2]  At thirty-six pages (without exhibits), Plaintiffs' first amended complaint is anything but "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Instead, it is replete with disjointed and repetitive factual allegations, legal conclusions masquerading as facts, citations to legal authority, and inappropriate legal argument, including argument intended to negate a possible defense of qualified immunity. The first amended complaint also contains over sixty pages of exhibits, including copies of newspaper articles, letters, and the transcript of an interview.

course of their investigation, these plaintiffs received direct intelligence (1) that an inmate—Randall Jordan Aparo—died at FCI in 2010 as a result of the retaliatory use of chemical agents by guards; and (2) that various FCI employees covered up the true circumstances of Aparo's death.  *Id.* at ¶ 6(b), (c).  Aparo's death was initially investigated in 2010–11 by FDOC and the Florida Department of Law Enforcement ("FDLE") pursuant to a Memorandum of Understanding between FDOC and FDLE.  *Id.* at ¶ 46.  Plaintiffs maintain that, because of the coverup, the initial investigation was badly flawed and, as a result, uncovered no wrongdoing. *Id.* at ¶¶ 48, 50(a)–(s).

At various times from May to December 2013, Land, Ulm, Glissom, and Padgett disclosed to their boss—FDOC's Inspector General Jeffrey Beasley—the information uncovered during their 2013 investigation at FCI, including the intelligence they gathered regarding Aparo's death.  *Id.* at ¶ 6.  In or about September 2013, these Plaintiffs caused the investigation into Aparo's death to be reopened, *id.* at ¶ 6(c); they asked Beasley for a task force and additional staffing to help with the investigation, *id.* at ¶ 6(b); they advised Beasley that a number of FDOC employees could "move from being *persons of interest* in the Aparo death investigation to *subjects or targets* of [that] investigation based upon the clear evidence of a cover-up," *id.* at ¶ 6(c); and they suggested to Beasley that FDOC

would be subject to a "black eye" as a result of the misconduct that they were uncovering during their investigation.  *Id.*  Land, Ulm, and Glisson reported their findings to FDLE and unspecified "federal authorities" in October 2013 or earlier. *Id.* at ¶ 51.

According to Plaintiffs, their reports to Beasley led Beasley (1) to threaten Land, Ulm, Glissom, and Padgett on account of the Aparo disclosures, telling them at a Christmas party in December 2013 that he would "have their ass for it;" *id.* at 6(e); and (2) to file (or cause to be filed)—also in December 2013—a retaliatory internal affairs complaint against Land, Ulm, Glissom, and Padgett, falsely charging them with misconduct during their investigation at FCI.  *Id.* at ¶ 6(f). FDOC's Deputy Inspector General Kenneth Sumpter was also informed about the Aparo intelligence, and he—like Beasley—allegedly retaliated by filing or causing to be filed the above-mentioned false internal affairs complaint.  *Id.* at ¶ 7.  That internal affairs complaint was still pending when Plaintiffs filed their first amended complaint.  *Id.* at ¶ 6(f).

Plaintiff Clark was present when Land, Ulm, Glissom, and Padgett made their disclosures to Beasley and Sumpter regarding Aparo's death.  *Id.* at ¶ 16, n.5. Clark himself disclosed to Beasley and Sumpter information that was gathered concerning an unrelated investigation into inmate deaths, including the death of

inmate Shawn Gooden.  *Id.* at ¶ 16.  Clark, along with Land, released the medical

records of inmate Gooden to FDLE during the course of that investigation without

an executed HIPPA release.  *Id.* at ¶ 6(i).  According to Plaintiffs, Beasley "made

numerous public statements within the Department to his chain of command that

FDLE is entitled to receive records in connection with death investigations without

the requirement of a HIPAA release."  *Id.*  Although Clark ultimately found no

violations concerning the death of Gooden, he alleges that

Beasley and Sumpter retaliated against him by filing a false internal affairs

complaint regarding an alleged HIPAA violation.  *Id.*  Land was also named in that

same internal affairs complaint.  *Id.*  The HIPAA complaint against Land and Clark

was filed in May of 2014, after *The Miami Herald* published a series of articles

regarding the unexplained deaths of several FDOC inmates, including Aparo and

Gooden.  *Id.* at ¶ 58.

On February 18, 2014, Clark, Land, Ulm, and Glisson met with FDOC

Secretary Mike Crews.  *Id.* at ¶ 53.  They reported to Crews their Aparo death

findings and "the fact that the Plaintiffs had determined that employees of the

Department of Corrections' Inspector General's Office had been identified by the

Plaintiffs as potential targets of criminal activity associated with the September

2010 investigation of the death of Aparo and a cover-up."  *Id.*  Secretary Crews

recommended that Plaintiffs report their findings to the Florida Office of the

Inspector General ("OIG"). *Id.* at ¶ 54.

In early March of 2014, in a taped interview, Land, Ulm, and Glisson

disclosed to OIG officials—specifically, Chief Inspector General Melinda Miguel

and Assistant Inspector General Dawn Case—the same information previously

disclosed to Beasley and Sumpter. *Id.* at ¶ 8. Land, Ulm, and Glisson allege that

Miguel later denied their requests for whistle-blower protection in retaliation for

the disclosures they made during the interview. *Id.* at ¶¶ 13, 17–18. Although not

present at the interview with Miguel and Case, Padgett submitted a written request

to OIG for whistle-blower status based on his Aparo disclosures to Beasley and

Sumpter. *Id.* at ¶ 22. Padgett alleges that Miguel failed to respond to his request

for whistle-blower status in retaliation for the disclosures that he and others made

about the death of Aparo. *Id.*

Unlike Land, Ulm, Glissom, Padgett, and Clark, Christina Bullins was not

employed by FDOC as an inspector but, rather, as a correctional probation

supervisor in Fort Lauderdale, Florida. *Id.* at ¶ 6(d). Although Bullins was not

involved in the 2013 FCI investigation in North Florida, she learned about Aparo's

death in 2010 through her brother, Joseph Avram, who was incarcerated at FCI

when Aparo died. *Id.* at ¶ 25. Avram advised his sister, Bullins, that he was a

witness to the events leading to Aparo's death.  *Id.*  According to Avram, Aparo

was "abused and gassed too much which resulted in his death."  *Id.* at ¶ 30.  In the

months immediately following Aparo's death, Bullins wrote to various FDOC

officials, including then Secretary Walter McNeil and Assistant Secretary Russell

Hosford, advising them about her brother's disclosures and about her brother's fear

of retaliation.  *Id.* at ¶¶ 28–31.

On March 3, 2011, approximately six months after Aparo's death, Bullins

received a letter from FCI's Warden, Diane Andrews, advising Bullins that her

allegations to Secretary McNeil and others concerning the death of Aparo were

"baseless."  *Id.* at ¶ 32.  Given what she termed "baseless" allegations, Warden

Andrews reported Bullins to FDOC's Inspector General, which resulted in the

filing of a MINS report.  *Id.* at ¶ 33.  "MINS" is an acronym for Management

Information Notes Summary which within Defendant FDOC "is a summary of an

incident report critical of an FDOC employee which may [or may not] result in

discipline."  *Id.* at ¶ 33 n.10.  Soon after Warden Andrews filed her MINS report,

Bullins filed a complaint with OIG.  *Id.* at ¶ 34.  That complaint was treated as a

whistle-blower complaint and was denied by Miguel.  *Id.*

On August 6, 2013, more than two years later, notice was sent to Bullins,

advising her that her employment would be terminated effective October 24, 2013,

if she did not respond to the notice.  *Id.* at ¶ 39.  Bullins, who was on leave

pursuant to the Family Medical Leave Act at the time, did not receive the notice

and did not respond, resulting in her termination on October 24, 2013.  *Id.*  Bullins

maintains that she was terminated as a result of the re-opening of the Aparo death

investigation in the fall of 2013 and her 2010–2011 disclosures regarding that

death.  *Id.* at ¶ 41.

Before she was terminated, in her capacity as a "volunteer political

coordinator and lobbyist for the Teamsters Local Union No. 2011," Bullins wrote

articles as a blogger for FloridaPublicEmployees.com.  *Id.* at ¶ 43.  Included in her

articles were several that were critical of FDOC, including articles written in the

months before her termination.  *Id.*.  Bullins's FDOC supervisor, Luis Pizarro,

allegedly told Bullins that she was terminated because "FDOC Tallahassee was

'out to get her' in part because of her prior protected disclosures regarding the

Aparo homicide."  *Id.* at ¶ 41.  Plaintiffs do not identify who made the decision to

discharge Bullins, and they do not allege that any of the named Defendants were

involved in that decision.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a

complaint "for failure to state a claim upon which relief can be granted."  To

survive a motion to dismiss, a complaint must allege sufficient facts to show that

the legal allegations are not simply possible, but plausible.  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Iqbal*, 556 U.S. at 678.  When considering a Rule 12(b)(6)

motion, the reviewing court must accept as true all allegations in the complaint and

view them in the light most favorable to the plaintiff.  *Chaparro v. Carnival Corp.*,

693 F.3d 1333, 1335 (11th Cir. 2012).

## III.  ANALYSIS

To prove a First Amendment retaliation claim, a public employee must show

that (1) he was speaking as a citizen on a matter of public concern; (2) his interests

as a citizen outweighed the interests of the state as an employer; and (3) his speech

played a substantial or motivating role in an adverse employment action.  *Leslie v.*

*Hancock Cnty. Bd. of Educ.*, 720 F.3d 1338, 1346 (11th Cir. 2013).[3]  The first

prong of the analysis sets out two predicates for First Amendment protection: a

---

[3]  The test under the Petition Clause is the same.  *See Borough of Duryea,*
*Pennsylvania v. Guarnieri*, 131 S. Ct. 2488, 2494–95 (2011) (retaliation claims by
public employees are subject to the same test regardless of whether they are made
under the Free Speech or Petition Clauses of the First Amendment).

public-employee's speech must be made *as a citizen* and the speech must be made on *a matter of public concern*.  *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  In this case, Defendants contend that the five inspector plaintiffs—Land, Ulm, Glisson, Clark, and Padgett (collectively, "Inspector Plaintiffs")—have failed to allege that they spoke as *citizens*.  Defendants do not dispute that Plaintiffs spoke on matters of public concern.

In *Garcetti*, the Supreme Court distinguished between speech made by public employees in their private capacities and speech made by public employees "pursuant to their official duties."  *Id.*  The Court held that, when public employees speak "pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Id.*  While enunciating the rule, the Court noted that it had "no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate."  *Id.*  The Court did state, however, that

> The proper inquiry is a practical one.  Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Id.* 424–25.[4]

In *Lane v. Franks*, 134 S. Ct. 2369 (2014), the Supreme Court clarified the rule announced in *Garcetti*, explaining that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Id.* at 2379. Instead, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of any employee's duties, not whether it merely concerns those duties." *Id.*

The five Inspector Plaintiffs in this case are inspectors or district supervisors in the FDOC Office of the Inspector General. Land and Ulm are Senior Law Enforcement Inspectors. 1st Am. Compl. at ¶¶ 11, 18. Glissom and Clark are—respectively—Supervisors for District III and IV investigations involving misconduct by FDOC employees. *Id.* at ¶¶ 16, 17. Padgett is an Institutional Inspector. *Id.* at ¶ 19. After they each participated in departmental investigations at an FDOC correctional institution, during which investigations they received intelligence regarding possible inmate abuse resulting in death and an ensuing coverup, they disclosed the intelligence to FDOC's Inspector General (Beasley), to

---

[4] In *Garcetti*, there was no "serious debate" about job duties, as the parties agreed that the plaintiff's speech was pursuant to his employment duties.

FDOC's Deputy Inspector General (Sumpter), and to FDOC's Secretary (Crews).

The disclosed information included possible improprieties—or worse—on the part

of FDOC correctional officers.  Clearly, these disclosures, which were gained as a

result of their official duties and made to their superiors in the chain of

command—namely, to Beasley, Sumpter, and Crews—fall within the rubric

"employee speech."

     Nevertheless, in their response to Defendants' motion to dismiss, the

Inspector Plaintiffs invite the court to find that the disclosures made to FDOC

officials constituted "citizen speech" rather than  "employee speech."  Among

other things, the Inspector Plaintiffs contend that:

> The court can certainly find that the disclosures made by
> the Plaintiffs . . . were outside the scope of their direct
> authority. The Plaintiffs were initially tasked with
> investigating if a corrections officer had sex with an
> inmate.  Outside the scope of those duties and extraneous
> thereto, they began to receive evidence of a far more
> sinister nature.  The original Randall Jordan-Aparo
> investigation had been closed in November 12, 2012, and
> *ipso facto* any investigation of that case would have been
> outside the scope of their duties in a strict sense.

Doc. 17 at p. 9.  This court is *not* persuaded by Plaintiffs' argument and does *not*

find that Plaintiffs' disclosures were made outside the scope of their direct

authority.  Whether or not they are tasked *specifically* to investigate an inmate's

death, inspectors employed by FDOC's Office of the Inspector General

*must*—*w*hen they receive intelligence that officer abuse may have caused an inmate's death—be expected to disclose that intelligence up the chain of command as part of their employment responsibilities.  That's what their job is, and any other conclusion would be nonsensical.

Whether the Inspector Plaintiffs were acting within their official duties when they made disclosures to persons outside the FDOC hierarchy—i.e., to OIG's Chief Inspector General (Miguel), to OIG's Assistant Inspector General (Case), and to FDLE—presents a closer question.  The answer, however, is the same—Inspector Plaintiffs spoke as employees and not citizens when they advised OIG officials and FDLE about their investigations, suspicious inmate deaths, and possible cover-ups.

Florida law makes clear that OIG and FDLE share responsibility with FDOC's inspectors for investigating possible misconduct—criminal or otherwise—within to the FDOC.[5]  For example, the Office of Chief Inspector General must "[a]ct as liaison and monitor the activities of the [agency] inspectors general."  Fla. Stat. § 14.32(i).  Within FDOC, "[t]he inspector general *and inspectors* shall be responsible for criminal and administrative investigation of matters relating to the Department of Corrections." *Id.* § 944.31 (emphasis added).

---

[5]  This court may—and does in this case—take judicial notice of matters of public record, including state statutes. *Mills v. Green* 159 U.S. 651, 657 (1895); Fed. R. Evid. 201(b), (c).

FDOC itself is required by law to "maintain a memorandum of understanding with the Department of Law Enforcement for the notification and investigation of mutually agreed-upon predicate events that shall include, but are not limited to, suspicious deaths." *Id.*  Plaintiffs, moreover, have themselves alleged that (1) FDLE, in fact, was involved with FDOC's OIG in the initial investigation of Aparo's death; (2) Beasley "made numerous public statements within the Department to his chain of command that FDLE is entitled to receive records in connection with death investigations;" (3) Secretary Crews recommended to the Inspector Plaintiffs that they report their findings to OIG officials; (4) Miguel and Case conducted their own investigation into the allegations of misconduct and statutory and regulatory violations within FDOC; and (5) FDOC's final report regarding its investigation into an internal affairs complaint against the Inspector Plaintiffs was submitted to OIG's Miguel for final disposition.

Given the context of their employment and the allegations they have made, it is clear that the Inspector Plaintiffs limited their communications to the community of persons jointly charged with the responsibility of investigating criminal and administrative misconduct within FDOC.[6]  The court can reach no other

---

[6]  It may well have been improper for the Inspector Plaintiffs to speak out as citizens on matters that were then the subject of an ongoing investigation—an investigation that they themselves reopened.

conclusion: the Inspector Plaintiffs spoke as employees and not as citizens.

Having spoken as employees and not as citizens, the Inspector Plaintiffs cannot

survive Defendants' motion to dismiss.[7]

The situation is different for Christina Bullins, as she was not an inspector

charged with the responsibility of investigating inmate deaths and possible cover-

ups.  Nonetheless, given the disjointed and prolix nature of Plaintiffs' first

amended complaint, the court is unable to divine whether, in fact, Bullins states a

First Amendment claim.  In Count II, the only count applicable to Bullins,

Plaintiffs do not make clear which, if any, of the listed retaliatory acts pertain to

Bullins.  Within their general factual allegations, Plaintiffs allege that (1) Bullins

made disclosures in 2010–11 to various FDOC and OIG officials regarding

Aparo's death, and (2) Bullins wrote articles as a blogger in 2014 that were critical

of FDOC.  They further allege that Bullins was the subject of a MINS report in

2011, that she was denied whistle-blower protection in 2011, and that she was

---

[7]  Plaintiffs chose to file this lawsuit as a First Amendment retaliation action.
Even *if* the Inspector Plaintiffs' whistle-blower disclosures to OIG officials Miguel
and Case were considered citizen-speech, the court would nonetheless find that
these Plaintiffs cannot survive Defendants' motion to dismiss.  Plaintiffs have cited
no cases clearly establishing that a decision to deny whistle-blower status or
protection to a complainant constitutes either an adverse employment action or the
denial of a public benefit for purposes of a First Amendment retaliation claim.  At
the very least, Miguel and Case would be entitled to qualified immunity with
regard to their alleged retaliatory actions.

terminated in 2013.  The first two of these alleged acts would not support a First

Amendment retaliation claim, and, as to the third act, the termination, Plaintiffs

have not alleged that any of the Defendants participated directly in that termination

decision.[8]  While the court finds that Bullins's claims—as currently

articulated—should be dismissed, Bullins should have an opportunity to amend her

claims if she can do so in conformity with Rules 8(a) and 11 of the Federal Rules

of Civil Procedure.

Accordingly, it is ORDERED:

1.  Defendants' motion to dismiss (doc. 16) Plaintiffs' First Amended

Complaint is GRANTED.  The claims of Aubrey Land, David Clark, Doug

Glisson, John Ulm, and James Padgett are DISMISSED with prejudice for failure

to state a claim.  The claims of Christina Bullins are DISMISSED with leave to

amend.

2.  Plaintiff Bullins shall have up to and including March 20, 2015, to file an

amended complaint, stating her claim(s) in conformity with Rules 8(a) and 11.

3.  If Bullins fails to file an amended complaint by March 20, 2015,

judgment of dismissal will be entered.

---

[8]  Because vicarious liability is inapplicable to § 1983 actions, "a plaintiff
must plead that each Government-official defendant, through the official's own
individual actions, has violated the Constitution." Id.

4.  Defendants' motion to strike (doc. 21) is DENIED.

DONE AND ORDERED this __4th___ day of ___March___, 2015.


s/ William Stafford_____
WILLIAM STAFFORD
SENIOR UNITED STATES DISTRICT JUDGE